IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2012

**STATE OF TENNESSEE v. VICTOR TREZEVANT**

**Appeal from the Criminal Court for Shelby County**
**No. 08-02225    Chris Craft, Judge**

---

**No. W2011-00818-CCA-R3-CD  - Filed March 5, 2013**

---

Defendant-Appellant, Victor Trezevant, appeals as of right his conviction for first degree murder committed during the perpetration of an attempted aggravated robbery, for which he received a life sentence.  In this appeal, the sole issue presented for our review is whether the evidence is sufficient to support his conviction of felony murder.  Specifically, Trezevant contends that the State failed to corroborate the testimony of his accomplices.  After reviewing the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Joseph A. McClusky, (on appeal); Lorna McClusky, (on appeal and at trial); and William Massey (at trial), Memphis, Tennessee, for the Defendant-Appellant, Victor Trezevant.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; Reginald Henderson and Ray Lapone, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On September 29, 2007, Devin Jefferson, Courtney Washington, Daeshawn Tate, and the Defendant-Appellant planned to rob the victim, Taylor Alexander.  The next day, while the victim was driving to his dorm room, Daeshawn Tate and the Defendant-Appellant approached the victim's car.  One of the men demanded the victim's money at gunpoint.  The victim attempted to drive away and was fatally shot.  Shortly after the victim's death, the Defendant-Appellant gave a statement of admission as to his involvement in planning to rob the victim.  However, the Defendant-Appellant insisted that he did not shoot the victim.

The following proof was adduced at trial. Mr. Jimmie Bradford, the victim's father, testified that the victim grew up in Nashville, Tennessee. The victim attended Samford University on a football scholarship and later transferred to the University of Memphis. On September 30, 2007, Mr. Bradford was notified that his son had been fatally shot. He identified two photographs of his son, one photograph prior to the victim's death and the postmortem photograph. The last time Mr. Bradford spoke with his son was on September 29, 2007. He identified the victim's cellular telephone number at that time as (615) 480-3316.

Officer Robert Frans, a veteran of the University of Memphis Police Services, testified that on the night of the offense he was working the three to midnight shift. At approximately 9:45 p.m. that night, he observed a car "crashed into a tree" on the east side of Zach Curlin Street on the campus of the University of Memphis. He observed the occupant inside the car with the steering wheel crushed down onto his lap. He contacted rescue and an ambulance. He could not determine the condition of the occupant and said he was "non[-]responsive." He observed the paramedics and the fire department pry the doors from the car to extricate the victim.

Officer Frans stated that he initially thought the incident was "a crash" and contacted the specialized traffic unit of the Memphis Police Department (MPD). However, once the victim was placed inside the ambulance he was notified of a gunshot wound to the victim. He then notified MPD felony response unit. The paramedics gave Officer Frans the contents of the victim's pockets including $7,400 in cash and a shell casing from the floorboard of the car.

Officer Frans stated that three students from the Carpenter Complex, one male and two female African Americans, approached him to advise that they overheard gunshots. He gathered their identification information and told them to wait for MPD, who eventually placed the students in the back seat of their squad cars. Officer Frans further identified photographs of the crime scene showing varying perspectives of the victim's car taken at the time of the crash and photographs of the area surrounding the Carpenter Complex Apartments on the campus of the University of Memphis. All photographs fairly and accurately depicted the scene on the night of the offense. Officer Frans explained that students who paid for parking privileges were provided with a parking permit access card. The card was swiped at the entry gate to gain access. There was additional parking outside the complex for those without an access card. Officer Frans said that an individual may walk inside the complex; however, a car could not enter without an access card.

Michael Wissman, an EMT with the Memphis Fire Department, testified that he responded to the scene on the night of the offense. When he approached the car the victim

was not breathing. He entered the passenger side of the car, placed the victim on a backboard, and slid him out of the passenger side of the car onto a stretcher. As he pulled the victim out of the car, he observed "a lot of blood starting to come from the victim." He observed the victim had "an entrance wound, underneath his right side on his right flank." He then advised his Lieutenant that the victim had "something that resembled a gunshot wound."

Officer Joseph Cunningham of the Memphis Police Department received a "shooting call with a man down" on the night of the offense. Upon his arrival to the scene, he observed a 1979 Lincoln Town Car off the east side of Zach Curlin Street against a tree. He spoke with the other officers on the scene and secured the crime scene. While at the scene, the University of Memphis Police provided Officer Cunningham with custody of the victim's personal belongings including a cellular phone, $7400 cash, and a parking permit.

On the night of the offense, Officer Gerald Paige of the Memphis Police Department Crime Scene Unit took photographs and collected evidence. He observed that the interior of the car had "heavy damage to the steering wheel, the dashboard, and there was a shoe on the seat on the passenger side of the vehicle." A nine-millimeter Luger spent bullet casing was recovered from the floorboard on the passenger side of the vehicle and admitted into evidence. Officer Paige also observed "a red substance, appearing to be blood on the front seat of the vehicle." He also drew a sketch of the crime scene that night, which was admitted into evidence.

Agent Cervinia Braswell, a forensic scientist assigned to the firearms identification unit of the Tennessee Bureau of Investigation (TBI), testified as an expert in the area of firearms identification. She received one bullet and one cartridge case from the investigation in this case. She was asked to determine if the bullet came from that particular cartridge case and whether she could determine the caliber and make of the weapon. She compiled a report of her analysis and findings, which was admitted into evidence. Agent Braswell determined that the cartridge case was an Independent brand, nine-millimeter cartridge case. She further determined that the bullet was a nine-millimeter caliber, full metal jacket bullet. On cross-examination, Agent Braswell acknowledged that the bullet recovered in this case was not connected to the shell casing recovered from the victim's car. She further confirmed that she could not connect the shell casing to a gun because a gun was not recovered in this case.

At the time of the offense, Katura Fennell was a student at the University of Memphis. In the early evening on the night of the offense, Ms. Fennell went to the Laundromat at Carpenter Complex to wash clothes with her friends, Lakeitha Odes and Shameeka Toney. When she arrived, she observed a gold Grand Marquis parked "backwards," obstructing the view of its license plate, with the engine off, the windows down, and three people inside.

-3-

She could not see their faces. She noted this behavior was unusual because there was normally a lot of activity going on in this area; however, on this occasion, she did not hear anything. After putting her clothes in the washer, she and her friends "stayed outside and associated" with some of the football players. When she returned to place her clothes in the dryer, she noticed two people walk by her. She did not "notice [this behavior] to be suspicious until they did it a second time." Twenty minutes later, she heard a gunshot. Fifteen minutes after she heard the gunshot, she saw the victim's car speed past her, hit a speed bump, and go airborne. Ms. Fennell additionally testified that she knew Devin Jefferson and did not see him while she was waiting on her clothes that night.

Mr. Darius Davis, a friend and teammate of the victim's, testified that he was aware that the victim had "come into some money." Mr. Davis stated that one night in the team hotel the victim "was sending pictures of some money he had . . . got from a casino or somewhere." Davis confirmed that the money the victim received was in cash. On the night of the offense, Davis was in his room and heard a gunshot. He also heard "a car screeching down the . . . backside of the apartments." Upon hearing this, Davis stepped outside of his room and observed "some guys coming from where the . . . gunshot had came from." He did not know how many individuals were present but was certain that it was more than one. A few minutes later, Davis received information that the victim had crashed his car across the street. At the time of the offense, Davis did not know Devin Jefferson or Erica Bell. On cross-examination, Davis acknowledged his concern for the victim because he was "flashing" his money around and people were "talking about it all over."

Mr. Steven Turner, a friend and teammate of the victim's, testified that he was outside the Carpenter Complex on the night of the offense. He spoke with "Katura and Kiki" for a while, and then more of his teammates came to the complex. Five minutes later, he heard a gunshot. He was about to walk in the opposite direction when he saw the victim's car come around the corner. He tried to flag the victim down, but the victim's car was going too fast. Turner said the victim "hollered something out the window," but Turner did not understand him. Twenty seconds later, two other individuals came around the corner. He did not see their faces. Turner said there was "a split second" between the gunshot and when he saw the victim's car.

Turner explained that a year before the offense, Devin Jefferson and the victim had a conflict over a girl. He testified that the victim and Jefferson "had some words and they began to fight." Turner witnessed the fight and said it took place outside in front of a crowd of people. Turner opined that the victim and Jefferson wanted to fight each other and that no one was seriously injured after the fight. Turner was also aware that the victim had won some money from a casino sometime in September 2007. He observed pictures of the money in quantities of "hundreds [and] twenties" in cash. On cross-examination, Turner recalled

-4-

the first name of the girl over whom the victim and Jefferson fought was "Erica." Turner acknowledged that during the fight, the victim attempted to walk away but Jefferson continued to fight. Turner said initially the victim "got the best of Jefferson," but the second phase of the fight resulted in a stalemate. Turner also clarified that he told police on the night of the offense that he saw the victim's car within "thirty seconds to two minutes" after hearing the gunshot.

Daeshawn Tate, also charged with the murder of the victim, testified that he had received no agreement from the State for his testimony and was nevertheless expecting some consideration for his truthful testimony. Tate acknowledged that he knew Devin Jefferson, Courtney Washington, and the Defendant-Appellant, Victor Trezevant. Tate said they grew up in the same neighborhood and went to school together. He had known Courtney Washington for approximately ten years and Devin Jefferson and the Defendant-Appellant for about twelve years. Just prior to the day of the offense, Tate was contacted by Devin Jefferson and asked if he wanted to make some money. Tate told him yes, and rode with Courtney Washington and the Defendant-Appellant, to Jefferson's dorm room, located in Richardson Towers. Of the four friends, Devin Jefferson was the only one enrolled as a student at the University of Memphis.

Once they arrived at Jefferson's dorm room, Jefferson told them about "a guy who was on campus who had a large lump sum of money and he was flashing it around." Tate said that the group discussed robbing the guy. Everyone in the group agreed to rob the individual; however, it was Tate's understanding that no weapons would be used. Tate left the room for about two hours to visit with a girlfriend. When he returned, the group told him he had taken too long and decided to do the robbery the next day.

The next day, Jefferson contacted Tate and asked if he was "ready" to which Tate replied, "okay." Tate contacted Courtney Washington, who picked him up in his car and drove to pick up the Defendant-Appellant. The group returned to the college campus and notified Jefferson to come downstairs once they arrived. Jefferson entered the car and showed them where the victim lived. Jefferson handed the access card to Courtney Washington, who was unable to operate the card. Jefferson got out of the car and swiped the access card for entry, which enabled the car to enter the parking lot. Tate identified the entry card that was used to enter the parking lot, which was admitted into evidence. Jefferson then pointed out where the victim lived and the group "left back out."

At this point, Tate said Jefferson separated from the group and Tate, Courtney Washington, and the Defendant-Appellant "backed in" and parked. They had "normal conversation" and realized they were low on gas. Tate testified that the Defendant-Appellant used his phone to call Alex Poindexter to ask for gas money. The group went to Alex

Poindexter's house and borrowed money for gas. They then returned to the same parking place and "backed in" to park. Tate called Jefferson before they left and when they returned.

While waiting in the car with Courtney Washington and the Defendant-Appellant, Tate said he called the victim and pretended to be someone else. He had obtained the victim's phone number from Courtney Washington who had gotten it from Devin Jefferson. Tate said he asked the victim where he was and that the victim told him he was taking care of some paperwork and would call him back. The group waited in the car and contacted Jefferson by phone and told him that the victim was not there. Eventually, the victim called Tate back and told him he was "here." Tate told the victim that he was "here." Prior to exiting the car, Tate saw the Defendant-Appellant pull out a gray nine-millimeter gun. Tate said he was unarmed.

Tate and the Defendant-Appellant walked through another entry way to the Carpenter Complex where the victim lived. They did not see the victim's car and turned around to walk away. After a few minutes, the Defendant-Appellant recognized the victim's car coming towards them and flagged it down. Tate went to the driver's side of the car and spoke with the victim. Tate asked how he was doing and if the victim played football for the school. Tate said the victim said, "I'm cool" and looked at him "kind of funny." Tate testified that the Defendant-Appellant came to the passenger's side of the car, "cocked the weapon, and asked him, man, give me the money."

Tate said the victim "kind of panicked, and he hit the gas, and he reached for the gun, and the gun went off. The gun went off. . . . [The victim] just kept going out of the . . . complex[.]" As the victim sped off, Tate asked the Defendant-Appellant, "what the f— did you shoot him for." Tate said the Defendant-Appellant replied, "[the victim] reached for the gun[.]" The two men then walked back to the car and drove to Alex Poindexter's house. Tate said that Courtney Washington was still inside the car, a four door gold Grand Marquis. Tate then called Jefferson and told him that the Defendant-Appellant shot the victim, they did not get any money, and the robbery did not "go right." Tate said they were in constant phone contact with Jefferson throughout the night of the offense. Tate confirmed that his phone number was (901) 649-7337. A few days after the offense, Tate was arrested and provided a statement to police detailing his involvement in the offense.

On cross-examination, Tate acknowledged that he was unaware of the felony murder law or the concept of criminal responsibility for another. At the time he gave his statement to the police he did not know that he could be charged with murder even though the Defendant-Appellant shot the victim. Tate also refused to cooperate with the police investigation until Officer Parks, his former high school football coach, came to speak with him. Officer Parks told Tate that if he had anything to do with the shooting, Tate should tell

-6-

the truth. Finally, Tate acknowledged that neither Courtney Washington or the Defendant-Appellant had a phone on the night of the offense.

Michael Stewart, the custodian of records for Cricket Communications, testified regarding the subscriber information pertaining to phone numbers (901) 949-2267 and (901) 649-7337. Mr. Stewart confirmed that Devin Jefferson was the subscriber for the phone number ending in 2267, and Deshawn Tate was the subscriber for phone number ending in 7337. On the night of the offense, there were eighteen calls between Jefferson's and Tate's phone. The first call occurred at 7:21 p.m., with repeated calls made every other minute or so until the last call at 11:09 p.m. The phone records for Deshawn Tate's phone number, ending in 7337, also showed a call to phone number (615) 480-3316. Mr. Stewart explained that code *67 was placed on the call to prevent the person being called from seeing the number of the incoming call. According to the records, around 9 p.m. on the night of the offense, seven calls were made between Jefferson's and Tate's phone numbers.

Ms. Tanera Tate, an employee at the University of Memphis parking office, managed the online system for students who purchased parking permits. She explained that a permit has a magnetic stripe on the back of it which enables cars to gain access through the gates. She retrieved her records from the night of the offense for permits belonging to the victim and Erica Bell. Erica Bell's permit was used to gain access into the gate at 7:08 p.m. and 7:34 p.m. The victim's permit was used to gain access into the gate at 8:42 p.m.

Ms. Erica Bell met the victim when they were in high school in Nashville. She stated that he was her boyfriend until college and they "went [their] separate ways." While in college, Bell met Devin Jefferson who became her boyfriend. Bell confirmed that the victim eventually attended the same college and had "friction" with Devin Jefferson. On the night of the offense, Bell, who also resided at the Carpenter Complex, picked up Jefferson from his dorm at about 7 p.m. She said she called Jefferson first and was going to cook him dinner. She used her permit to access the gate at 7:08 p.m., as reflected by the parking records, when she returned to the Carpenter Complex with Jefferson. Bell said once at her dorm room, she and Jefferson ate, took a shower, and went to bed. She said Jefferson did not remain there the entire time. She said Jefferson went outside multiple times in ten-minute intervals to talk on the phone. Between 10:20 p.m. and 10:40 p.m., Jefferson left and did not return. Jefferson used Bell's car to leave. Bell denied using her permit at 7:34 p.m. and could not explain the entry. Bell did not know Courtney Washington or Daeshawn Tate; however, she stated that she had met the Defendant-Appellant.

Ms. Bell gave two statements to the police on the night of the offense. In the first statement, Bell told the police that she saw Jefferson "in eye-shot the entire time" and omitted that Jefferson had her parking permit because she did not know it was significant.

On cross-examination, she stated that she had received a picture showing a large sum of money from the victim. Bell did not know how long before the offense she had received the picture.

Mr. Alex Poindexter testified that he was friends with Devin Jefferson, Courtney Washington and Daeshawn Tate, and that he was close friends with the Defendant-Appellant. On the day of the offense, Poindexter saw the Defendant-Appellant twice. He explained that the Defendant-Appellant came to borrow gas money. He said Courtney Washington drove the Defendant-Appellant to Poindexter's house which was ten minutes away from campus. He saw the Defendant-Appellant again a couple of hours later at his house. He said Courtney Washington drove the Defendant-Appellant to his house and Daeshawn Tate was in the car with them. Up until this point, Poindexter had not seen Devin Jefferson. He said after Daeshawn Tate and Courtney Washington left, Devin Jefferson came to his house. Poindexter said that Jefferson came by himself and the Defendant-Appellant was still at his house. Poindexter said they learned of the offense on campus on the news but neither the Defendant-Appellant nor Jefferson discussed any involvement in the offense with him. He said Jefferson and the Defendant-Appellant left his house together around eleven that night. Poindexter said that Jefferson "just showed up" at his house that night without calling first.

Sergeant Mundy Quinn, a veteran of the Memphis Police Department, testified that on October 7, 2007, Courtney Washington, Daeshawn Tate, and the Defendant-Appellant were brought into custody at different times and placed in different rooms in his bureau. Sergeant Mundy advised the Defendant-Appellant of his <u>Miranda</u> rights through an Advice of Rights form, which was admitted into evidence. The Defendant-Appellant signed the form, acknowledging that he understood and waived his rights. Sergeant Mundy stated that he was already in the process of interviewing Daeshawn Tate when the Defendant-Appellant arrived and was requested to assist with the Defendant-Appellant's interview. Sometime later, Sergeant Mundy returned to interview Daeshawn Tate, and the Defendant-Appellant ultimately provided a statement to Sergeants Collins and Justice. On cross-examination, Sergeant Mundy said the suspects were taken into custody in the following order: Courtney Washington, Daeshawn Tate, and the Defendant-Appellant.

Lieutenant Mark Miller of the Memphis Police Department testified that he was involved with the instant homicide investigation. Through the course of his investigation, he determined Daeshawn Tate, Courtney Washington, and Devin Jefferson were suspects. Lieutenant Miller said the Defendant-Appellant was "named by a witness, and then, we picked up one of the co-defendants based on that same information, and he was identified[.]" He said Kimberly Jude, the girlfriend of Daeshawn Tate, was the witness who identified the Defendant-Appellant. Asked if he interviewed the Defendant-Appellant, Lieutenant Miller said "not technically." After completing the investigation for the evening, Lieutenant Miller

entered the Defendant-Appellant's interview room with an arrest ticket to obtain a thumb print from the Defendant-Appellant. The Defendant-Appellant inquired as to the charges against him, and Lieutenant Miller told him he was being charged with first degree murder. When the Defendant-Appellant asked how they could charge him with that offense, Lieutenant Miller told him that there were witnesses who identified him as planning the robbery and also as the person responsible for shooting the victim. At this point, the Defendant-Appellant told Lieutenant Miller that although he was involved in the robbery Devin Jefferson was the actual shooter.

Sergeant Connie Justice of the Memphis Police Department was responsible for typing the Defendant-Appellant's formal statement. Prior to taking his statement, Sergeant Justice advised the Defendant-Appellant of his Miranda rights again, which he waived. The Defendant-Appellant's formal typed statement read, in pertinent part, as follows:

[Question]: Do you know Taylor [Bradford]?

[Answer]: No.

[Question]: Do you know who is responsible for the death of Taylor Bradford?

[Answer]: Yes. Devin Jefferson.

[Question]: Were you present at the time that [Taylor] Bradford was shot?

[Answer]: Yes.

[Question]: Who else was present when Taylor Bradford was shot?

[Answer]: Daeshawn Tate.

[Question]: In your own words, explain what happened when Taylor Bradford was shot?

[Answer]: Devin called me on Alex's phone at Alex's house about two or three weeks ago, and he told me that he was fighting this dude whose ex-girlfriend he was talking to now and dude was hating on him. It was whenever the last fight was between Devin and the dude, and the dude slammed him in a tree. He said this dude is stalking him, and he's been getting locked up by the police because the dude said he had weed. So, Devin called us back and said that there was a dude up on campus flashing money. He called me back

-9-

and told us to meet him at Memphis State on Saturday night, the night before the shooting. He met us downstairs and we took the elevator up to room number 601, I think, but it's the last room to the left. It has Jefferson on the room, and I think he shares the room with his brother, Quez. Devin got in the shower. Me, Daeshawn, and Quez, was rapping on the computer. They got a microphone on it. We didn't talk about it up there. Daeshawn left and went with his girlfriend. Me, Cornbread, and Devin, went downstairs and got something to eat. Then, we got in the car and we started talking about it. He said he knew this dude that had three to four thousand dollars. He said he could use the key and get us in there because he used to talk to the girl that Taylor used to like. But it was too late. Daeshawn and his girlfriend came back. All of us finished, was standing outside smoking. Daeshawn talked for a minute, then he left. Me and Cornbread drove off and Devin went back in the dorm. We asked Devin when he wanted us to come back, and he said that he had to go to work at twelve o'clock p.m., and Cornbread had to go to work at eleven a.m. He said he was going to call us. On Sunday, September the 30th, 2007, Cornbread was driving, Daeshawn was on the passenger side, and I was in the backseat. We was looking for Devin. We went back up to the Towers. Daeshawn texted Devin and asked him where he was, and Devin called him back. Devin asked me if I remembered where Erica lived, and I didn't, so Daeshawn handed me the phone, and Devin told me where to go. He told us he was going to talk to us to tell us where to go. It was like by a big arrow on a sign, like some apartments, where he told us to turn. When he got past the lights, he told us to look for the arrow that points us where to turn, and when he turned - - I'm sorry - - when we turned, we were in a parking lot. These were the second set of apartments. Devin said he was in a white truck. He asked if we saw him, and then, said forget it, because he was fixing to come see us and was getting out of the truck. He got in the car. It was about eight or eight fifteen p.m. He gave us a Memphis State pass. I think it was Erica's. It had to be. Cornbread was driving and he couldn't do the pass thing. We sat there for a few minutes, and finally, he got it when Devin was about to do it himself. We get around in there. He told us to make a right, and drive straight back. Devin pointed out where dude lives. He said that his was the one upstairs to the right. We kept on driving and drove straight out of the complex. Then Devin showed us where to park. It was near the gate where you go in on the other side of the lot. We made a left when we came out of the gate and we backed in. Then Devin told us that he would be back and asked us if we wanted to keep his pass. We kept the pass and Cornbread hung the pass on the rearview mirror or in the seat pocket. Before Devin left, we told him that we needed some gas money and some cigarettes. Devin told us that

he ain't got it, he's broke. So, we sat around and waited on him for about ten minutes. I called Alex on Daeshawn's phone and asked him if I could borrow ten or fifteen dollars. He said, yes. So, Daeshawn called Devin and told him that we would be back. While Devin was talking to Daeshawn, Devin told him that the people who live near dude are some weak assed n------. He said he didn't know if any of them has any phones in the wall, and then came back and said, yes, they do. Devin had given dude's phone number on Saturday, but we didn't know his name. On Sunday, Devin gave us dude's name said it was Taylor. So, after Devin gave us Taylor's name, Daeshawn called him. It had to be like 8:45 p.m. Daeshawn was using his regular voice and asked him where he was and how long before he came back to the house. Taylor told him that he didn't know, it would be a couple of hours. By the time that we went over to Alex's house, Alex gave me the money, we went to the gas station, pumped the gas, Devin was calling us, saying he was there. So, we're back on our way up there. We park in the same spot. Me and Daeshawn, I didn't remember where Devin showed us that the man lived because I was so nervous. So, we called Devin and told him to show us where. We called Devin three times while we were in the car. We called Taylor two times and he called us back two times. Me and Daeshawn got out of the car. We went straight to the right and made a left. We were walking up that way and we seen Devin. All we were going to do is pretty much scare him. Me and Dae saw so many police we were about to leave waiting on Devin. Me, Devin, and Daeshawn, we see two white people. It was a girl and a guy. But I don't think they saw us. We turned back around so we could walk up and wait for those people to leave and go back in the apartment or whatever. Right where he lived, we walked back down there and made a right were we first came from. By the time we got there, Devin said, there he goes right now, he was driving past. It looked like a two door white or gray looking clean car that I thought it was a Cadillac, but now, I know it was a Lincoln. How it was supposed to went was I guess Dae was there to intimidate dude for his size and I was there for the money, also fifteen hundred a piece. Devin just sat everything up. Devin was about to show us where Taylor lived again, but Taylor happened to drive past us. Me and Dae flagged Taylor down and got him to stop and Dae started talking to him about football and the fraternities. Taylor looked to his left and saw Dae, then he looked to the right and saw Devin, and then looked on around and saw me. Then dude tried to pull off. Dae pulled his arm off the car and Devin leaned on the front passenger door and looked in there at Taylor. Dude tried to pull off again. Then Devin pulled out a gun and said, pop. Devin tried to pull off again - - I'm sorry - - dude tried to pull off again, but he stopped, and he said, ahhh, and then he drove off. Dae asked Devin, why did

-11-

he shoot? Devin started walking off, going straight like the way Taylor lived, and me and Dae started walking the other way. But we seen two or three white people. The only one I remember is a chubby white girl. So, we ducked back around and walked back to the left and that's when we saw a black guy up on the balcony. The guy on the balcony asked us if we saw the shooting and I told him no. He asked if we were all right, and we said yes, and we walked on. People were looking at us. I saw some guy who looked like he played football and he was with a black girl when we was almost to the car. We got in the car and drove to Alex's house. I got dropped off at Alex's house. Dae went over to his girl's house. Devin called me at Alex's and asked me do I got the pass. I told him, no. I left it in Cornbread's car. Alex has a Buick, so, me and Alex went to Dae's girlfriend's apartment to find Cornbread's car to get the pass back. Cornbread had stopped at Big Wheel's house on Rockwood and I stopped and got the pass out of Cornbread's car and went straight back to Alex's house. Devin pulled up in a red Saturn. He came up on the porch. It was me and Alex sitting on the porch. I gave him the pass back, and then he told me that Erica kept telling me there were ambulances out there. Devin wanted me to ride up to Kroger's with him real quick. Once I got there, I discovered the reason that he wanted me there was because he was giving his weed to a guy in a Lexus. While we were riding, everybody kept calling Devin and accusing him of doing it, but he was basically telling them that he didn't do it, that he was the wrong person to talk to because he didn't give a f---- about that man. When we were getting ready to leave Kroger[']['[s], his manager at Foot Locker called him. I think he spent the night at his manager's house. Devin dropped me off at Brittany's house on East Parkway. He had tears on his face and he said he loved me, that I was like a brother to him, and he gave me fifteen dollars.

[Question]: Did you speak to Devin after the incident?

[Answer]: Yes, Monday about eight p.m. He told me he just got through being questioned and he was straight but the only thing that was f------up was that Erica had told them that he left the room and wasn't there the whole time, she was supposed to tell the police he was there the whole time.

. . . .

Finally, Sergeant Justice showed the Defendant-Appellant three photographic displays from which he identified Devin Jefferson, Courtney Washington, and Daeshawn Tate. On cross-examination, Sergeant Justice agreed that her investigation revealed "bad blood"

-12-

between Devin Jefferson and the victim. She further clarified that while Courtney Washington and Daeshawn Tate arrived at the homicide office before the Defendant-Appellant, all of the suspects were separated in different offices. Sergeant Justice was also involved in taking Devin Jefferson's statement and agreed that Devin Jefferson changed his story several times. On re-direct examination, Sergeant Justice said that, based on her investigation, Devin Jefferson sent the other three individuals to rob the victim "to get the money," and not because of any "bad blood."

Courtney Washington, also charged with first degree felony murder of the victim, explained that his attorney approached the State about testifying in the Defendant-Appellant's trial. He anticipated some consideration for his testimony but was not made any specific promises from the State. Courtney Washington went to high school with Devin Jefferson, Daeshawn Tate, Alex Poindexter, and the Defendant-Appellant. He acknowledged that he was involved in a plan to rob the victim. The day before the offense, he drove the Defendant-Appellant and Daeshawn Tate to Devin Jefferson's dorm room. Once inside the dorm room, Devin Jefferson began to tell the group about "a guy that had money on him." Devin told them they could rob the individual and that the money would be easy to get. He said the group planned the robbery because they needed money. He admitted that his role in the offense was to drive the group in his car, a gold 1994 Grand Marquis.

Courtney Washington confirmed that after the group discussed the robbery, Daeshawn Tate left and returned too late to execute the robbery that day. The group agreed to commit the robbery the following night. The next day, Courtney Washington picked up Daeshawn Tate and the Defendant-Appellant. They returned to campus to pick up Devin Jefferson so he could "show [them] who [they] were going to rob and where [the victim] stayed." Devin Jefferson had the access pass and showed the group the victim's dorm room and the type of car he drove. Courtney Washington dropped off Devin Jefferson, and the group waited on his call to advise them when the victim was there.

Washington confirmed the group left to get gas money from Alex Poindexter and, upon their return, "just regularly pulled in" to the parking space. Washington testified that the Defendant-Appellant and Daeshawn Tate got out of the car and walked toward the victim's room. Four minutes later, Washington heard a gunshot and the Defendant-Appellant and Daeshawn Tate were "walking fast back to [his] car." After they drove off, Washington heard the Defendant-Appellant say, "man, I shot dude."

Courtney Washington said that the Defendant-Appellant had a gun when he exited his car. Washington was certain he had a gun because, according to their plan, "[the Defendant-Appellant] was going to have the gun and Daeshawn was going to get the money." Washington testified that the Defendant-Appellant had a nine-millimeter gun. Washington

-13-

asked the Defendant-Appellant why he shot the victim, but the Defendant-Appellant "was panicking" and did not give him an answer. Washington then dropped off everyone and went home. Washington agreed that it was not part of the plan to shoot the victim and that they only wanted to get the money. Washington was shown three photographic displays from which he identified Devin Jefferson as the individual who planned the robbery, Daeshawn Tate as the individual with the Defendant-Appellant when the victim was shot, and the Defendant-Appellant as the person who shot the victim. Washington said the original plan was to rob the victim at his dorm room, not in his car.

On cross-examination, Washington agreed that Devin Jefferson and Daeshawn Tate were the only two in the group with working cell phones that night. He further confirmed that after getting gas, the group returned to campus and "backed in" to a parking place by the Laundromat. Washington clarified his earlier testimony and said a gun was not involved in their initial discussions to rob the victim the day before the offense. However, he omitted from his statement to the police any discussion of an agreement made on the day of the offense for the Defendant-Appellant to have a gun as part of the robbery. Of all his friends who were involved in this case, Washington was closest with Daeshawn Tate.

Dr. Karen Chancellor, the Chief Medical Examiner for Memphis and Shelby County, reviewed the autopsy report of the victim and said her "major finding in this case [was] a gunshot wound. . . to the thorax[.]" The bullet entered the right side of the victim's chest and injured several organs inside the body, resulting in internal bleeding. She confirmed that the nine-millimeter bullet examined by Agent Braswell was recovered from the victim's body. With the assistance of several autopsy photographs of the victim, Dr. Chancellor described the bullet path taken within the victim's body and identified the location the bullet was recovered from the victim's body. In her expert opinion, Dr. Chancellor testified that the cause of the victim's death was a gunshot wound. There was no soot or stippling found on the victim's body and his toxicology report did not reveal the presence of any drugs or alcohol.

The Defendent-Appellant offered the following proof. A week prior to the offense, Jennifer McCray, the victim's girlfriend at the time, heard Devin Jefferson threaten to kill the victim. McCray testified that Jefferson specifically said, "if I catch [the victim] slipping, I'm going to kill him." McCray believed "slipping" meant if Jefferson saw the victim alone. The Defendant-Appellant did not testify.

The jury convicted the Defendant-Appellant as charged in the indictment and he received a sentence of life imprisonment. This timely appeal followed.

**ANALYSIS**

-14-

The Defendant-Appellant challenges the sufficiency of the evidence supporting his conviction for felony murder. He specifically contends that State failed to provide sufficient evidence to corroborate the accomplice testimony of Daeshawn Tate and Courtney Washington. In response, the State contends that there was sufficient evidence to corroborate the testimony of the accomplices in this case. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748

(Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2006). The mental state required for conviction of felony murder is the intent to commit the underlying offense. T.C.A. § 39-13-202(b). In this case, the underlying felony was attempted aggravated robbery. A person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense,

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). The aggravated robbery charge in this case required the State to prove beyond a reasonable doubt that the robbery of the victim was "[a]ccomplished with a

deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a).

It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). Tennessee law requires only a modicum of evidence in order to sufficiently corroborate the testimony of an accomplice. State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). This Court has previously held:

> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplices testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (citations omitted).

The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). In other words, the corroboration must include some fact establishing the identity of the defendant as a criminal actor. Boxley, 76 S.W.3d at 387. It is generally for the trier of fact to determine whether sufficient corroboration exists. Id. (citing Shaw, 37 S.W.3d at 903). However, as this Court has previously pointed out, "[e]vidence which merely casts a suspicion on the accused . . . is inadequate to corroborate an accomplice's testimony." Id. (quoting Griffis, 964 S.W.2d at 589).

Viewed in the light most favorable to the State, we conclude that there was sufficient evidence to corroborate the testimony of accomplices Courtney Washington and Daeshawn Tate. Prior to the date of the offense, it was well-known by many of the victim's friends that he had an extremely large amount of cash with him. On the night of the offense, a student

saw Washington's car parked on the campus with three people inside. The phone records showed a rash of phone calls between Jefferson and Tate, with most of the calls occurring around 9:00 p.m. Significantly, the phone records showed a call from Tate's phone number to the victim's phone number with a code to prevent the victim from identifying the number of the incoming call. Ms. Bell testified that Jefferson was with her for dinner in the Carpenter Complex, the same apartment complex as the victim's. However, the online management records for the gated entry system showed that Ms. Bell's access card was used to re-enter the complex a second time on the night of the offense, at 7:34 p.m., and Ms. Bell testified that she did not use her card. Ms. Bell additionally testified that Jefferson was on the phone in ten minute intervals throughout the night of the offense, and that he was not with her between 10:00 p.m. and 10:40 p.m. Alex Poindexter testified that the Defendant-Appellant, Washington, and Tate came to his house together on the night of the offense. Finally, Tate testified that he saw the Defendant-Appellant with a nine-millimeter gun, which is the same caliber of the bullet that was recovered from the victim's body.

Significantly, the Defendant-Appellant provided a detailed statement to police outlining his involvement in this case. He conceded in his brief that his statement admitting to his involvement in the robbery corroborates the testimony of Tate and Washington except for the identity of the shooter. Because Washington and Tate identified the Defendant-Appellant as the shooter, the Defendant-Appellant argues, without authority, that this portion of their statements "should have been excised from [their] . . . testimony." We disagree. We have found no authority which would require the trial court to "excise" portions of accomplice testimony that are in conflict with the Defendant-Appellant's statement. Moreover, Washington said that the Defendant-Appellant admitted to shooting the victim. This was clearly a question of credibility for the jury to determine. We conclude that the Defendant-Appellant's statement, along with the above proof, constitutes more than sufficient corroboration of the accomplice testimony in this case. See State v. Alisha J. Glisson, No. M2006-02115-CCA-R3-CD, 2008 WL 624929 *9 (Tenn. Crim. App. March 5, 2008) perm. app. denied (Tenn. Aug. 25, 2008) (finding sufficient evidence corroborating accomplice testimony in felony murder conviction where accomplices' testimony was corroborated by the Defendant-Appellant's confession and the taped conversation corroborated numerous elements and details of the accomplices' testimony); State v. Stanley Lawson, No. 01C01-9607-CR-00320, 1997 WL 661483, at *5 (Tenn. Crim. App. Oct. 24, 1997). As in Alisha J. Glisson, neither the accomplices' testimony nor the Defendant-Appellant's confession standing alone would be sufficient to establish the felony murder in this case, however, this evidence taken together is sufficient to support to the Defendant-Appellant's conviction. The Defendant-Appellant is not entitled to relief.

## CONCLUSION

-18-

Upon our review, we conclude the evidence is sufficient to support the Defendant-Appellant's conviction for murder in the perpetration of an attempted aggravated robbery. The judgment of the trial court is affirmed.


_____
CAMILLE R. McMULLEN, JUDGE